Seaverns v. Presbyterian Hospital.

---

64   463<br>173s  414

## Joshua S. Seaverns v. The Presbyterian Hospital.

1. TRUSTEES—*Who are Not—Application of Purchase Money.*—The fact that a person loaning money upon land has an interest in having the money applied in the first instance to the clearing off of a prior mortgage, is not sufficient to constitute him a trustee for that purpose.

2. NOTICE—*To an Agent, When not to His Principal.*—The fact that a loan agent who negotiated a loan secured by mortgage deed, had notice of the purpose for which the money was borrowed and the purpose to which it was to be applied, does not amount to notice to the lender and thereby constitue him a trustee to see that it is so applied.

3. SAME—*To an Agent.*—Notice of facts to an agent is constructive notice to the principal, where it arises from, or is at the time connected with the subject-matter of his agency.

**Mortgage Foreclosure.**—Error to the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in this court at the March term, 1896. Affirmed. Opinion filed June 1, 1896.

PENCE & CARPENTER, attorneys for plaintiff in error, contended that any knowledge or information possessed by an agent at the time of acting as agent for a corporation, with respect to the matter upon which he is to act, is notice to the corporation, and notice to an executive officer or managing agent is notice to the corporation itself, if it relates to matters within the scope or duties of such agent. 1 Morawetz on Cor., Sec. 540; Mechem on Agency, Secs. 718–721; Holden v. N. Y. etc., Bank, 72 N. Y. 286; Union Bank v.

Campbell, 4 Humph. 394; Waynesville Nat. Bank v. Irons; 8 Fed. Rep. 1; Hart v. Farmers Bank, 33 Vt. 252; Fulton Bank v. N. Y. & S. Canal Co., 4 Paige 127; Mayor v. 10th Nat. Bank, 111 N. Y. 457; Bank of Pittsburg v. Whitehead, 36 Am. Dec. 186 to 200, and note; N. M. Hills Mfg. Co. v. Camp, 49 Wis. 130; Houseman v. Girard Mutual Bldg. Co., 31 Pa. St. 256; Dresser v. Norwood, 17 Com. Bench 466; The Distilled Spirits, 11 Wall. 367.

Subsequent ratification or acquiescence have the same effect as prior authority. G. C. & S. R. R. Co. v. Kelly, 77 Ill. 426; Alcott v. Tioga R. R. Co., 27 N. Y. 558; Bank of U. S. v. Dandridge, 20 Wheat. 64.

The rule is that the knowledge or notice possessed by an ordinary agent who deals adversely with a corporation, and in his own interest is not binding, but the exception is that a president or chairman of a finance committee, or other executive officer of a corporation having the power and control and management of concerns of a corporation, though he acts in his interest, and in fraud of the rights of the corporation, will bind the same, where he possesses the knowledge, or has notice upon any given subject. Bank of U. S. v. Davis, 2 Hill 454; Union Bank v. Campbell, 4 Humph. 394; Holden v. N. Y. & Erie Bank, 72 Ill. 286; Mayor v. 10th Nat. Bank, 111 N. Y. 446–457; Village of Port Jervis v. First Nat. Bank, 96 Ill. 558; First Nat. Bank of Milford v. Town of Milford, 36 Conn. 93; Mechanics Bank v. Schaumberg, 38 Mo. 228; North River Bank v. Aymar, 3 Hill 262; Nat. Security Bank v. Cushman, 121 Mass. 490; In re Carew's Estate, 31 Beavan 39; Powles v. Page, 17 C. B. (3 M. G. & S.) 16; Morawetz on Corporations, Sec. 540.

Duty of a corporation, having knowledge of the way in which the proceeds of sale of security were to be applied upon specific debts, requires it to see to the application of the purchase money. 2 Perry on Trusts, Secs. 597, 598, 790, 796; 1 Lewin on Trusts, *pages 453, 457, 462; Forbes v. Peacock, 12 Simons, 590; Duffy v. Calvert, 6 Gill. (Md.) 487, 517; Skeel v. Stocker, 11 Brad. 143; Mechem on Agency, Secs. 780, 785, 786; Blair v. Sennott, 134 Ill. 87.

. GREEN, ROBBINS & HONORE, attorneys for defendant in error.

The rule of the application of the purchase money was adopted in early times to protect those interested in trust estates. It is opposed to all modern methods of doing business. It has no place in the law of agency. Its wisdom is even questioned as applied strictly to trust estates. The tendency has been to restrict rather than to enlarge the field of its application.

Story's Eq. Juris., section 1124, quotes Sir William Grant as making it questionable, whether the admission of the doctrine is not, in general, productive of more inconvenience than real good; for, although in many instances, it is of great service to the *cestui que trust*, as it preserves his property from peculation and other disasters, to which, if it were left to the mere discretion of the trustee, it would necessarily be subject; yet, on the other hand, it creates great embarrassment to purchasers in many cases; and especially where, as in cases of infancy, the parties in interest are incapable of giving a valid assent to the receipt and application of the purchase money by the trustee, and Mr. Story, after discussing the rule, says:

§ 1135. "These are some of the most important and nice distinctions which have been adopted by courts of equity upon this intricate topic; and they lead strongly to the conclusion, to which not only eminent jurists, but also eminent judges, have arrived, that it would have been far better to have held in all cases that the party having the right to sell had also the right to receive the purchase money, without any further responsibility on the part of the purchaser as to its application."

The law in England has been much restricted by statute. Lord St. Leonard's Act, 22 & 23 Vict., c. 35, s. 23; Lord Crainworth's Act, 23 & 24 Vict., c. 145, s. 29; 44 & 45 Vict. c. 41, secs. 36 and 71; Perry on Trusts, sec. 798.

"It may be stated that the strict English rule is not favored by the American courts, although they apply the doctrine, in cases where it can not be avoided."

It seems to have been refused recognition in this State.

"The testator made certain bequests to each of his chil-·dren, payable respectively as they became of age. Power is expressly given to the executors to sell real estate for the purpose of raising funds with which to pay these several legacies. Ogden H. Whitman, one of the beneficiaries under the will, became of age in 1852, and was entitled to the bequest in his favor. The sale to John Fisher was made in the spring of 1854. It does not appear but the exact case had arisen where the executors had the clear right under the will to sell real estate independently of the decree of the court. The purchaser was under no obligation to see to the application of the purchase money." Whitman v. Fisher, 74 Ill. 147.

But assuming the rule applies to cases of agency it does not arise in cases like the present.

"Where the trusts are defined, yet the money is not merely to be paid over to third persons, *but is to be applied by the trustees to certain purposes which require on their part time, deliberation and discretion,* the purchaser is not bound to see to the due application of the purchase money, as, where for any reason it would be unreasonable and burden-some to require the purchaser to look after the matter and would really amount to constituting him a trustee, he will be free from the control of the general rule." Story Eq. Jur., Sec. 1134; Perry on Trusts, Sec. 790, 794.

If the trust is to pay debts generally, the purchaser can not be subject to the rule that he shall see to the application of the purchase money; or if the trust is to pay debts and legacies, or *to pay a particular debt and all other debts,* or to pay legacies, or to pay debts and apply the balance to the support of some one, there can be no obligation to see to the payment of the debts and legacies. *If one debt is named, but is coupled with others not named, the same considerations apply.* In such trusts the testator must be presumed to have intended that his trustees should have the full power to give receipts for the purchase money in order to apply it to the purposes pointed out. Perry on Trusts, Sec. 795.

To the principle under consideration is referable the well-known rule that a purchaser is not bound to see to the application of his money where the trust is for payment of debts generally; for, to ascertain who are the creditors, and what is the amount of their respective claims, is matter of trust involving long and intricate accounts, and requiring the production of vouchers, which the purchaser would have no right to require. And mere absence of the statement of the purpose for which the money is wanted will not make a purchaser or mortgagee liable on the ground of presumed knowledge that the money was to be applied otherwise than for payment of debts. So if the trust be for payment of a particular debt named and of the testator's other debts. 2 Lewin on Trusts, star page 456.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

This writ of error is prosecuted to reverse a decree of foreclosure entered in a suit brought by the defendant in error to foreclose two certain mortgages.

One of the mortgages for $10,000 was made by a prior owner of the mortgaged premises, and the other for $2,000 was made by the plaintiff in error after he became the owner of the same premises; and the indebtedness secured by each matured on the same day. These two mortgages are hereinafter referred to as the Peabody-Houghteling mortgages, and were purchased by the defendant in error on July 21, 1894.

It is not claimed that there could have been any successful defense against either mortgage in the hands of any one except the defendant in error.

The right of defense against a foreclosure of the mortgage, by the defendant in error, is claimed to exist because of a failure by the defendant in error to perform a legal obligation which rested upon it to pay and discharge the same at the time it purchased them.

It is claimed that such legal obligation arose out of certain dealings and attendant circumstances, with reference to

a subsequent mortgage for $25,000, made by the plaintiff in error to the defendant in error upon the same premises.

Those dealings were substantially as follows :

In the year 1890, and running into 1891, the plaintiff in error incurred expenses aggregating several thousand dollars for repairs and improvements to the building that stood upon and formed a part of the mortgaged premises.   Such expenses were rendered necessary to put the building into condition to meet the agreement in such respect that plaintiff in error had entered into with his lessees thereof.

The firm of Bogue & Hoyt (afterward Bogue & Co.) had been for a number of years the renting and financial agents of the plaintiff in error, and undertook to direct the repairs and improvements, and to advance the money therefor, either directly or from moneys which they would procure through discounting the notes of plaintiff in error.

Plaintiff in error does not seem to have been a man of large means, and so far as the control of the property in question was concerned, he appears to have submitted almost wholly to the judgment and management of the Bogues, between one of whom, at least, and himself most affectionate and trustful relations existed.

Apparently, too, the expectation of the plaintiff in error, and perhaps of the Bogues also, at the inception of the repairs, was that their cost could not exceed $6,000, and could be met by the rents to accrue within the reasonable limits of time for which temporary discounts could be made, or during which the Bogues could carry the necessary advances, but by or before the early spring of 1891 it became known to the plaintiff in error that the repairs, then about half completed, would cost as much as $19,000.

He testified that he knew it as early as February 13, 1891, and that "about the middle of 1891" Mr. Hamilton B. Bogue told him he would have to make a mortgage.   It is quite certain that he meant to say he was told so about the middle of some month early in 1891, for the mortgage that he executed was made early in April, 1891.   However that may be, we see that he received the following let-

ter from Hamilton B. Bogue, which bears the date mentioned by him as being the date before which he knew how largely the repairs had involved him.

"Chicago, Feb. 13th, 1891.

Joshua Seaverns, Esq.

Dear Friend : At the finish of expenses on the warehouse, including the Peabody-Houghteling loan and advances, there will stand against the property fully $31,000. I think the largest loan possible to obtain naturally will be $20,000.

The Aultman lease, you know, runs nine years from next May 1st, paying the first four years $3,500 per year, and the following five years $4,500 per year, all in regular monthly payments.

Sincerely yours,

Hamilton B. Bogue."

The "Peabody-Houghteling loan" spoken of in the letter means the two mortgages for $10,000 and $2,000, respectively, heretofore specified by us as being the ones to foreclose which this bill was filed, and the difference between them and the mentioned sum of $31,000 represents the $19,000 expended and needed to make the repairs.

The Bogues had not rendered to the plaintiff in error any statement of the account as it existed between them at the time that letter was written, and did not inform him how much he owed them at any time before the contemplated mortgage was made, although he knew he owed them a considerable amount. They did, however, have conversations together from time to time, until the mortgage was executed and delivered, with reference to the manner in which the proceeds of the new loan should be applied, and it is plainly established that the agreement by the Bogues was that they would first apply such proceeds to the extinguishment of the two Peabody-Houghteling mortgages, and that thereafter what remained should be kept by them to reimburse them for what plaintiff in error owed them, and for subsequent advances which they should make on account of the building.

George M. Bogue, a member of said firm of Bogue &

Hoyt (succeeded by Bogue & Co., in which he was also a member), was at the time president of the Presbyterian Hospital, the defendant in error, and chairman of its finance committee, and from the time he became such, his said firm acted as the agents of the hospital in the matter of all loans made by it, aggregating over $100,000.

There was a by-law of the hospital that all of its investments by way of loans upon real estate should be in first mortgages, and should be first submitted to and approved by the board of managers.

There is no evidence of any application for the new loan having been submitted to, or approved by, the manager or the finance committee, and the first that appears to have been known of it by anybody connected with the hospital, except George M. Bogue, is shown by the following letter to its treasurer :

                            " CHICAGO, March 31, 1891.
George W. Hale, Esq.,
            Treasurer Presbyterian Hospital,
                153 La Salle street, Chicago.

DEAR SIR : We have negotiated a loan to A. B. & J. S. Seaverns for $25,000, on their property at the corner of 26th and Butterfield streets, the details of which will be given when we hand the papers covering the loan. Please send us your check for the amount of the loan, $25,000.
                Very truly yours,
                            BOGUE & HOYT."

On the same day of the date of the letter, the treasurer sent to Bogue & Hoyt the following bank check, which was deposited by Bogue & Hoyt to the credit of their account in the Metropolitan National Bank, and paid the next day through the clearing house.

" No. 489.                CHICAGO, March 31, 1891.
Union Trust Company, N. E. Cor. Dearborn and Madison
        streets:

Pay to the order of Bogue & Hoyt twenty-five thousand dollars.
                    PRESBYTERIAN HOSPITAL,
$25,000.            By George W. Hale, Treasurer."

On the next day Bogue & Co. wrote and sent the following letter to the plaintiff in error:

"CHICAGO, April 1st, 1891.

J. S. Seaverns, 202 S. Water St., Chicago.

DEAR SIR: We are approaching the point where we will soon be able to fix up the new loan on your 26th and Butterfield streets property. Herewith we send you trust deed, to be executed by yourself, and Mrs. Seaverns, together with principal note and interest coupons. These are all made payable to your own order, you will therefore please sign them "Joshua S. Seaverns" and indorse them in blank.

Please sign all these papers and return them to us at your earliest convenience, so that we may have the abstract brought out.

Very truly yours,

BOGUE & Co."

Pursuant to that letter, the plaintiff in error, with his wife, executed the therein referred to trust deed, bearing date March 31, 1891, and his own principal note secured thereby for $25,000, due five years after date, and appropriate interest notes.

Presumably the papers were delivered to Bogue & Company on the date the trust deed was acknowledged, for on that day Bogue & Co. transmitted the note to the treasurer of the hospital under cover of a letter of that date, as follows:

"APRIL 6, 1891.

Geo. W. Hale, Treas. Presbyterian Hospital, 153 La Salle St., Chicago.

DEAR SIR: Herewith we hand you principal note of Joshua S. Seaverns for $25,000, together with ten interest coupons for $750 each, all dated March 31, 1891—the principal note being due on March 31st, 1896. These notes cover your payment to us of $25,000 on the 31st ult.

The loan is secured by trust deed from J. S. Seaverns and wife to Geo. M. Bogue, on the west 14.24 feet of lot 7 and and all of lots 8 and 9 in W. H. Adams' subdivision of part of the east half of the S. E. ¼ of Sec. 28, 39, 14, with im-

provements. Insurance policies for $25,000, properly assigned, with attorney's opinion certifying that good title is vested in J. S. Seaverns, are kept in our vault subject to the directions of the holder of the note. The trust deed has been sent to the recorder's office, and when recorded will be sent you to be filed with the notes.

Very truly yours,

Bogue & Company."

The Bogues did not, either with the money so furnished to them by the hospital, or in any other way, take up the outstanding Peabody-Houghteling first mortgages, and it was not until after their insolvency became known, nearly three years afterward, that the hospital came to knowledge of the fact that the $25,000 mortgage was not a first lien upon the mortgaged premises; and neither did the plaintiff in error know whether the mortgage had been sold or not, or how the money had been applied if received by the Bogues. Upon one pretext and another, the Bogues put off any accounting with him concerning the mortgage, and never told him they had negotiated it, although he testified that he supposed they had sold it, but that they repeatedly said it was not " adjusted," and that they would " adjust it pretty soon," whenever he made his request to them for an accounting.

The interest on all the mortgages was paid by the Bogues for the plaintiff in error up to about the time of their failure, which was apparently about March, 1894; and it appears by the testimony of plaintiff in error that he knew that interest was paid by the Bogues for him upon the Peabody-Houghteling mortgages up to as late as March 11, 1894, and approved of their so doing. He did, however, testify that he did not then know that the $25,000 mortgage had been negotiated, and that in no way was he informed that at the same time when the Bogues were paying the interest on the Peabody-Houghteling mortgages, they were also paying interest on the $25,000, and that prior to the time of their failure, no statement made by them to him included any item for such interest.

After the Bogues failed, the hospital discovered that the $25,000 mortgage held by it was a second lien, and subject to the Peabody-Houghteling mortgages for $12,000, and on July 21, 1894, it bought those mortgages.

It was, also, not until after the Bogues failed that the plaintiff in error first learned that the hospital held the $25,000 mortgage; and after the hospital bought the Peabody-Houghteling mortgages, the plaintiff in error refused to pay any more interest on them, his claim being, as we understand it, that the hospital did then only what it should have done long before, by making application to that extent of the proceeds of the $25,000 mortgage obtained through the Bogues.

Because of the interest not being paid, the Hospital filed this bill to foreclose said two mortgages.

It was concededly the duty of the Bogues, as between themselves and the plaintiff in error, to apply as much of the proceeds of the $25,000 mortgage as was required for that purpose to pay off and extinguish the Peabody-Houghteling mortgages.

But does their failure to do so, give to the plaintiff in error a right to insist that it was also a duty incumbent upon the hospital?

Counsel for him state their contention in that regard to be, that it " was the duty of the hospital to see to the application of the said money paid for said $25,000 mortgage to the payment and satisfaction of said two mortgages so sought to be foreclosed, and that the hospital is chargeable with the performance of said duty, and that said two mortgages so sought to be foreclosed, should be declared satisfied by the decree of the court. That the hospital bought said two mortgages so sought to be foreclosed, long subsequent to the negotiation to it of the said $25,000 mortgage, and that the court should declare the purchase of the said two mortgages, to be a satisfaction and performance of the hospital's duty, and such purchase should be treated as a payment and cancellation thereof."

The answer to the contention hangs mainly upon the

question, partly of law and partly of fact, as to whose agents the Bogues were in that particular matter.

In some respects connected with the transaction the Bogues appear to have acted as the agents of both parties.

So far as the sufficiency of the security and the regularity of the papers were concerned, and to pay over the money to the mortgagor, there appears to be no doubt but they acted as agents of the hospital. But as to the application of the money, by or for the mortgagor, we can see no element of agency on their part for the hospital. That was a matter wholly resting upon the terms of their agency in behalf of plaintiff in error.

Nor are we able to concede that there was a duty, in the sense of a trust, imposed upon the hospital in the matter.

It is true that George M. Bogue was president and chairman of the finance committee of the hospital, upon which committee certain duties were imposed concerning loans of its funds, but his official duty to the hospital to see that its money was loaned only upon first mortgages, did not create a trust relationship by the hospital to whoever might borrow its funds through Bogue.

There was no fiduciary relationship between the plaintiff in error and the hospital. The latter had placed its funds in the hands of the Bogues to loan to the plaintiff in error upon his mortgage. When the mortgage was executed and delivered, the funds in the hands of the Bogues became the funds of the plaintiff in error to be applied as had been agreed upon between them, and their misappropriation after that time by the Bogues was a matter answerable for between themselves.

There can be no question under the evidence but that the Bogues were the agents of the plaintiff in error to receive the money for the mortgage; and it is just as certain that the Bogues were authorized by the hospital to deliver the money to the plaintiff in error upon receipt of the mortgage.

When the exchange of the mortgage for the money was made, the transaction was a completed one, so far as the

hospital was concerned, and neither by contract or by operation of law was the hospital chargeable with any duty concerning the money after that time.

It never was a matter of trust on the part of the hospital, and the doctrine of the application of trust money or duty has no place in the case, as we view it.

The fact that the hospital had an interest in having the money applied in the first instance to the clearing off of the first mortgage, was not sufficient to constitute it a trustee for that purpose, nor did the fact that George M. Bogue, or the Bogues as a firm, have notice of the purposes to which the money was to be applied, amount to notice to the hospital, and thereby constitute it a trustee to see to such application.

There is no claim that the hospital ever had any notice of the purposes for which the money was borrowed, except such as was obtained through the fact that its president was also a member of the firm that negotiated the mortgage.

Undoubtedly, the general proposition is true, that notice of facts to an agent amounts to constructive notice to his principal of matters connected with the subject-matter of the agency, where the situation is such as that the presumption exists that he will communicate the facts to his principal.

But here no such presumption exists. The loan was in part for the purpose of obtaining money to reimburse the Bogues for the $19,000 which they had paid in part and contemplated disbursing for the repairs to the building, and they were to receive and hold the money for that purpose, in part. It was neither agreed nor expected that the funds would be paid over by the Bogues to the plaintiff in error. All that was contemplated was, that after taking up the Peabody-Houghteling mortgages, the Bogues themselves should keep the balance to apply on the account between themselves and plaintiff in error.

Under such circumstances, the Bogues' interest was adverse to the interests of the hospital, and the presumption upon which the rule depends fails.

The plaintiff in error knew the fact that the Bogues' interest was opposed to that of the mortgagee, and we do not see how he can invoke the application of the rule of notice, even though it were otherwise applicable. The doctrine with reference to notice in cases of this kind is stated in Higgins v. Lansingh, 154 Ill. 301 (p. 367).

Moreover, the plaintiff in error in no way disputes the entire validity of the $25,000 mortgage, but on the contrary, expressly acknowledges it to be valid and binding upon him in every respect, and has continued, with full knowledge of all the facts, to pay all interest upon it as it has accrued.

It appears, also, that as between himself and the Bogues, the plaintiff in error has received the benefit of a considerable part, at least, of the $12,000, which should have been devoted by them to the extinguishment of the mortgages being foreclosed. But we do not consider it necessary, and perhaps it would not be proper, under the state of the case, to enter upon that phase of the case, although it might probably be urged that even though the duty to see to the application of the $12,000 did devolve upon the hospital, yet the plaintiff in error, having lost nothing, or but a part, because of a failure by the hospital in that regard, could not successfully ask for a cancellation of the mortgages sought to be foreclosed.

To remedy the infirmity of the security to their $25,000 mortgage, the hospital bought the first mortgages. It is not claimed that there existed any equity against those mortgages in the hands of the original holders thereof from whom the hospital bought them, and no other equity against them is now claimed, except that the hospital should have seen to it that they were extinguished by application to that extent of the $25,000 mortgage.

We do not question the accuracy of the propositions laid down by counsel for plaintiff in error, nor of the authorities they cite, as applied to appropriate facts, but do differ with them upon the true conclusions to be drawn from the facts of this case.

The decree of the Circuit Court will therefore be affirmed.